# The City of Philadelphia *versus* The Philadelphia and Reading Railroad Company.

58  253
201  577

58      253
23 SC ⁸199

1. The Commonwealth determined to build a railroad from Columbia to the intersection of Broad and Vine streets in Philadelphia; with the proviso that before any part of the railroad between the west bank of the Schuylkill river and the intersection of said streets should be contracted for, the city should engage to construct and continue the railroad to Cedar street; the city constructed the latter road: *Held,* that the city had complete ownership of the road so constructed; the city road was a portion of the line of the state road, but not a portion of the road.

[City of Philadelphia *v.* Philadelphia and Reading Railroad Co.]

2. The city was bound to maintain its Broad street road as long as it was needed and used for the purposes of its original construction ; but when the legislature changed the terminus of the state road and severed the connection, the city was released from the further maintenance of its road.

3. Under the Act of May 10th 1850 the canal commissioners sold to the Philadelphia and Reading Railroad Company the portion of the state road east of the inclined plane at Philadelphia; the act was their warrant which they could not amplify; strict construction is the rule in such cases.

4. The conveyance by the canal commissioners refers itself to the Act of Assembly, and this was necessarily the extent of the title which was to pass.

5. "Appurtenances," &c., in the deed to the railroad company was not sufficient to pass any interest in the city road. The only right the Commonwealth had was in its serviency which had ceased.

6. One entire railroad will not pass as an "appurtenance" to another railroad.

7. Property built by a municipal corporation for its corporate use may be removed when the interests of the community demand it.

8. Buildings erected on public grounds or highways acquire no right either on account of time or expenditure.

9. A section in a public act relating only to private parties is to be regarded as a private act, and must be pleaded if relied on.

April 2d 1868. Before THOMPSON, C. J., STRONG, READ, AGNEW and SHARSWOOD, JJ. Certificate from Nisi Prius.

The Philadelphia and Reading Railroad, on January 25th 1864, filed their bill against the city of Philadelphia, averring:—

1. That they were a corporation under the Act of April 4th 1833.

2. That by the Act of March 21st 1831, the defendants were authorized to construct a railroad on Broad street from Vine to Cedar street; that on April 28th 1831, the councils of the defendants passed a resolution engaging to construct and continue a railroad from the intersection of Broad and Vine streets to Cedar (now South) street; that on May 6th 1831, the canal commissioners resolved that the resolution of councils justified them in entering into contract for work upon the Columbia and Philadelphia Railroad; that a railroad was constructed by said city in the year 1833 and connected with the Columbia and Philadelphia Railroad, and has since been in public use for the transit of cars.

3. That in pursuance of said resolution the Commonwealth of Pennsylvania proceeded to make the contract for the completion of the Columbia and Philadelphia Railroad to Broad and Vine streets; and the same was so completed about the year 1834, and was then connected with said road so constructed by the city upon Broad street; and from thence hitherto the said railroads have remained connected.

4. That under the authority of the Act of April 2d 1831, the Southwark Railroad Company constructed a railroad extending from the river Delaware to Broad and South streets, to connect with the city railroad, the primary object of which was to form

[City of Philadelphia *v.* Philadelphia and Reading Railroad Co.]

a continuous line of railway from the interior of the state through the city of Philadelphia to tidewater.

5. That under the authority of the Act of May 10th 1850, the Commonwealth sold, and by deed dated December 27th 1850, conveyed to the complainants that portion of the Columbia and Philadelphia Railroad lying east of the inclined plane on the west side of the Schuylkill river, and extending to and connected with the railroad built by said city at Broad and Vine streets, and under said conveyance the complainants have since held and owned the same; the purchase was made and a large portion of the consideration-money paid upon the faith of the existence and continuance of the right of connection with the city railroad.

6. That warehouses, manufactories, coal-yards, &c., had been established along the line of said railroads—complainants deriving large revenue from freights to and from said establishments, which would be cut off by a severance of the connection of said railroads.

7. That the councils of defendants May 18th, 1863, passed an ordinance authorizing and directing the superintendent of city railroads to remove the city railroad on Broad street from Olive street to South street.

8. That the enforcement of the ordinance would inflict upon the complainants irreparable injury, would take from them without compensation a valuable franchise secured to them by law— in violation of the 5th article of amendments to the Constitution of the United States, and of the 10th section of the 9th article of the Constitution of this state; would violate the faith of the city which was pledged "to construct and *continue* a railroad," &c., upon the faith of which the Commonwealth was induced to expend money in extending the railroad from the west bank of the Schuylkill river to Broad and Vine streets.

9. That the removal of the city railroad would diminish the revenue derived by the city from tolls, and interrupt the large traffic in coal, &c., passing over the same to be forwarded southward. And praying:—

1. That the defendants might be restrained from removing the city railroad on Broad street.

2. That it might be decreed that complainants had the right to connect with and use the city railroad, and that defendants were without authority of law to remove it.

3. That it might be decreed that this right could not be taken from them except upon compensation therefor.

4. That any legislative authority empowering the destruction of the connection between said railroads might be declared unconstitutional.

May 5th 1864. A special injunction was ordered as prayed for.

[City of Philadelphia *v.* Philadelphia and Reading Railroad Co.]

May 18th 1866.   Defendants filed their answer, by which they admitted the principal averments of the 1st, 2d, 3d, 4th, 5th, 6th and 7th paragraphs of the bill, denied the averments of the 8th paragraph, and averred " that the sole design of the several Acts of the Commonwealth and ordinances of the city of Philadelphia was to transport freight and passengers over the Philadelphia and Columbia and Broad Street Railroads, and over no other railroad; that there existed no legal or equitable right in the Philadelphia and Reading Railroad to compel the city of Philadelphia to maintain the said Broad street railroad; that defendants had no connection with the Southwark Railroad Company; that the right of connection with the city railroad is not mentioned in the deed from the Commonwealth to complainants; that the city of Philadelphia did not accept the provisions of the said Act of March 21st 1831, nor did said city engage to construct and continue said railroad on Broad street until April 28th 1831, which was after the said Southwark railroad was incorporated as aforesaid; and the said city did not, until January 10th 1833, adopt any ordinance for the construction of said railroad on Broad street; that said Broad street railroad was simply a continuation of the state road laid under the provisions of the Act of March 21st 1831; that under said act the Commonwealth constructed a line of railway from Columbia to Philadelphia, entering the said city at its then northern boundary at Broad and Vine streets, but that by subsequent public legislation the said line was altered in the year 1849, by an Act of Assembly passed the 10th day of April 1849, so that the city of Philadelphia was entered in its centre at Market street, over the river Schuylkill, and after the completion of said road over the bridge at Market street and down said street, the continuity of said Philadelphia and Columbia Railroad from the canal basin to the intersection of Vine and Broad streets was destroyed; by reason of which the engagement or contract between the Commonwealth and the city was rendered *impossible*, and there existed no equitable right in the Commonwealth or her grantee to insist upon the maintenance of the railroad on Broad street; referring to the Acts of April 10th 1849, Pamph L. 642, May 10th 1850, Pamph. L. 738, April 15th 1851, Pamph. L. 684, May 3d 1860, Pamph. L. 780; that the Commonwealth by the Act of May 16th 1861 has expressly recognised the right of the city councils to direct the removal of the railroad.

After the filing of replication and proofs the court decreed a perpetual injunction in accordance with the prayer of the complainants.

The defendants appealed, and assigned for error the decree of the court.

[City of Philadelphia v. Philadelphia and Reading Railroad Co.]

*D. W. Sellers* and *T. Cuyler* (with whom were *Charles E. Lex*, *James Lynd* and *H. M. Watts*), for appellants.—The contract, if any were created, was rescinded by the consent of both parties. The rule of construction of a contract is the same with reference to the Commonwealth as to natural persons : Commonwealth *v.* Penna. Railroad, 1 P. F. Smith 351.

*J. E. Gowen* and *Meredith* (with whom was *George W. Biddle*, for appellees).—This case has been adjudicated : 11 Wright 325.

Where a contract is to be rescinded, it must be *in toto*, and the parties put *statu quo :* Hunt *v.* Silk, 5 East 449 ; 2 Pars. on Contr., 192 ; Franklin *v.* Miller, 4 Ad. & El. 599 ; Beed *v.* Blandford, 2 Younge & Jervis 278 ; cited also Commonwealth *v.* Penna. Railroad, 1 P. F. Smith 351 ; Campbell *v.* Fleming, 1 Ad. & El. 40 (28 E. C. L. R.) ; Milner *v.* Tucker, 1 C. & P. 15 (12 E. C. L. R.) ; Shaw *v.* The Turnpike Company, 3 Penna. R. 445 ; Scott *v.* Crawford, 4 M. & G. 1031 (43 E. C. L. R.)

The right of the state to have the Broad street railroad maintained passed to the Philadelphia and Reading Railroad as appurtenant to their purchase : Philada. & Erie Railroad *v.* Atlantic & Gr. W. Railroad, 3 P. F. Smith 20 ; London & S. W. Railway Co. *v.* S. E. Railway Co., 20 E. L. & Eq. 417 ; Great Northern Railway Co. *v.* Manchester, Sheffield and Lincolnshire Railway Co., 10 Id. 11 ; West London Railway Co. *v.* London and N. W. Railway Co., 18 Id. 481 ; Wright *v.* Chestnut Hill Iron Co., 9 Wright 475 ; Washburne on Easements 34 ; Allen *v.* Scott, 21 Pick. 25 ; Runnells *v.* Bullen, 2 N. H. 532 ; Oakley *v.* Stanley, 5 Wend. 523 ; Whitney *v.* Olney, 3 Mason 280 ; Broom's Maxims, Title " Rights and Liabilities of Property," p. 199 ; Hinchcliffe *v.* Earl of Kinnoul, 5 Bing. N. C. 1 ; Buckholder *v.* Sigler, 7 W. & S. 154 ; Grubb *v.* Guilford, 4 Watts 223 ; Blaine's Lessee *v.* Chambers, 1 S. & R. 169 ; Pickering *v.* Stapler, 5 S. & R. 107 ; Strickler *v.* Todd, 10 S. & R. 63, 69, 70 ; Swartz *v.* Swartz, 4 Barr 353 ; Kieffer *v.* Imhoff, 2 Casey 439 ; Lefevre *v.* Lefevre, 4 S. & R. 241 ; McKellip *v.* McIlhenney, 4 Watts, 317 ; Campbell *v.* McCoy, 7 Casey 263 ; Penna. Railroad *v.* Canal Commissioners, 9 Harris 9.

The opinion of the court was delivered, May 7th 1868, by

THOMPSON, C. J.—It admits of no controversy, that the city is armed with ample authority to remove from its streets and thoroughfares every obstruction or impediment to their free use as such by the public, unless legalized by the authority of law, and whether that is the case in the instance in hand, is the question now for determination.

On the 18th of May 1863, an ordinance was passed by councils, directing the proper authorities, among other things, to remove

8 P. F. SMITH—17

[City of Philadelphia *v.* Philadelphia and Reading Railroad Co.]

the city railroad from Broad street, between Olive and South streets, but not before the 1st of the ensuing October. To prevent the execution of the ordinance, the complainants filed this bill on the 25th of January 1864, and prayed a special injunction against the city to' restrain action under it. On May 4th 1864, a preliminary injunction was granted, the case having been heard at Nisi Prius, before a full bench, four judges sitting as adsessors. The matter rested until after answer, replication and pleas were filed, when in September last, the case being at issue, a final decree was made at Nisi Prius, perpetually enjoining the city from removing the rails between the points mentioned, and from that decree this appeal was taken by the city.

From the bill we learn, that the company claims to restrain the city, on the ground that pursuant to the Act of 10th May 1850, the Commonwealth sold and conveyed to them all that portion of the Columbia Railroad, lying between the foot of the inclined plane on the west side of the Schuylkill, and its intersection at Vine and Broad streets, at the north line of the city; and they aver in their bill, that "one of the leading motives inducing the complainants to purchase the said bridge (over the Schuylkill) and railroad, and to pay a large sum therefor, was in consideration of the right of continuing the connection which had long theretofore been made, and in use between the said railroad so purchased, and the railroad so built by the city; so that they the plaintiffs could, in their cars, and without transhipment, deliver coal (in which traffic they were chiefly engaged), lime, lumber, and other freight along Broad street, and by means of the Southwark railroad, to the Delaware river, and to the Philadelphia, Wilmington and Baltimore Railroad." And they further aver, "that the said purchase was made, and a large portion of the said consideration-money paid upon the faith of the existence and continuance of the said right."

It will be perceived from this, that the plaintiffs do not proceed on the ground of any express contract on the part of the city to maintain this road for their benefit as assignees of the portion of the state road which they purchased, but rather on the ground of an equitable right, resulting from the previous use of it by the state, and the disadvantage it would be to them to be cut off from the warehouses and depôts established on Broad street along the line of the city and Southwark railroads, and from the Broad street connection with the Philadelphia, Wilmington and Baltimore Railroad. Treating the city as a party capable of acting and being bound by contract, or estoppel, in the absence of the former, we must look to the latter alone as the foundation of the plaintiffs' claim.

We inquire, therefore, first; has the city done any act which

would, if denied or repudiated, be a fraud on the rights of the plaintiffs ?

The road in question was built exclusively at the expense of the city, on one of its main streets, over which the state did not exercise sovereign power to devote it to the use of a railroad, and of which we are not shown she ever attempted the exercise in this connection. In March 1831, the state resolved to complete, as soon as practicable, a railroad, "beginning at the intersection of Vine and Broad streets, at the city of Philadelphia, and thence extending to the end of the canal basin at Columbia, in the county of Lancaster, a distance of eighty and three-fourths miles," twenty of which, at the Philadelphia end of the line, to be finished first and equipped. The object of this undertaking was the completion of the cherished project of the state, to construct a great line of improvement by canal and railroads between the Delaware river at Philadelphia and the Ohio at Pittsburg. In the accomplishment of the main object, secondary and subordinate purposes very clearly appear, one of which was to benefit Philadelphia by furnishing greater facilities for trade and intercourse between the city and surrounding country, and as early as the completion of the twenty miles would permit. Another was to provide for conveying that trade into the heart of the city, the policy of the state being not to incur the expense or difficulty of entering with their road into the city limits, definitely fixing its terminus at the intersection of Vine and Broad streets on the north line of the then city. We are bound, I think, to consider the second *proviso* of the act in the light of this view of the legislature. It reads thus :—

"And provided also, That before the canal commissioners shall contract for any part of the railroad between the western shore of the river Schuylkill, and the intersection of Vine and Broad streets, the mayor, aldermen and citizens, by their proper authorities, shall engage to construct and continue the railroad from the intersection of Vine and Broad streets, to Cedar street;" and the city was further authorized to make other connections with the state road by other railroads besides that on Broad street with the right applicable to all such "to charge and receive the same tolls as may be charged on the Pennsylvania Railroad according to distance." It seems too evident for controversy, that this proposition, when agreed to and complied with, at the sole cost of the city, would constitute as complete an ownership in the city of the road so built, as could be conceived of under any grant of a franchise to any company whatever. The proposition was accepted by the free resolve of the city, and the road was in due time constructed, at its own expense, over a street in the undisputed jurisdiction of the city, and the tolls authorized to be taken were received by the city and placed in its treasury. It was therefore

[City of Philadelphia *v.* Philadelphia and Reading Railroad Co.]

in law and fact, what it has always been in name, a city rail-road.

It has been argued interchangeably, sometimes, that this under-taking was in consideration of the building by the state of the Philadelphia and Columbia Railroad ; sometimes, in consideration of the construction of a road to the west side of Schuylkill; and sometimes, in consideration of the state's fixing the terminus of their line of road at the intersection so often mentioned. There is nothing in the act to give countenance to these theories. The state had unconditionally, and alone by the exercise of her sover-eign will, determined on building a railroad between Philadelphia and Columbia, and under the same impulse fixed its eastern termi-nus. The canal commissioners were invested with no authority to change the legislative resolve in regard to either of these par-ticulars, whether the city assented or not. They might delay con-tracting for building the end of the line until that determination was ascertained. What course the state would have ultimately pursued, if the city had refused, it is not necessary to speculate about. In view of the great advantages to be derived from the completion of the contemplated road to the city, in securing the vast trade of the interior and the West, and of the Ohio and Mis-sissippi rivers and tributaries, no thought of any but one result could have entered the legislative mind in regard to what the city would do. The state, therefore, invited it to undertake to continue the road which she had resolved to build, into its limits at its own cost and for its own benefit. Neither contract nor sover-eign authority was exerted to produce the result. It was pro-duced solely in view of the contemplated advantages expected to be derived from the construction and use of the entire line under-taken by the state. To suppose the inducement to have been the construction of a railroad to the west side of Schuylkill, would be scarcely less than to ignore the intelligence of the city and legis-lature both.

I freely concede that the acceptance of the proposition by the city and its execution, implied that the cars from the state road should have the right of passage over it on the terms of paying toll as long as the state desired its use. This was the original de-sign. This, of course, while it constituted the city road a por-tion of the line of the state road, did not constitute it a part of that road. It was an independent road in every other respect, if the cost of construction and the right to its earnings could make it so. It was constructed solely under the inducement of the advantages to be derived from the state railroads, and no other. The city was willing for that, and figuratively speaking, might be desirous to open its gates to the vast and varied com-merce of the interior and boundless West, promised by the comple-tion of the state road, and hold quite a different opinion in regard

to the trade of a mere locality, constituted of lime, coal and lumber. If the former was the inducing cause to the action of the city, I am not able to perceive the justice or right in attempting to hold it bound to maintain its road for a different purpose, not in connection with any state improvement, but with a private corporation. To hold this would be to place the great street of the city under the actual control, to a great extent, of a corporation, never thought of when the road was authorized and agreed to be built, and without the assent of the city or its authorities legally expressed at any time. Such injustice as this the Commonwealth has never been chargeable with, and there is no evidence she intends it in this instance.

We have conceded that the city was bound to maintain its Broad street railroad, as long as it was needed and used for the purposes of its original construction. This is not to be doubted. But in 1849 the legislature passed an act to avoid the inclined plane on the west side of the Schuylkill, and to construct a new road to supersede the old thence into the city. The new road was built, and it carried the state railroad, the Philadelphia and Columbia Railroad, into the city across Market street bridge, and down that street by and with the consent and co-operation of the city authorities, into the very heart of the city, and there it remains. This severed all connection between the state and city roads. The latter was no longer possible to be used in the purposes of its creation. The city was therefore undoubtedly released from its further maintenance for that purpose; and that that purpose was, as I have already more than once said, to extend the state railroad into the city, is palpable on the face of the Act of Assembly of March 1831, and of the resolves of the city authorities and acts of the canal commissioners referred to in the plaintiffs' bill, of which, by the recital thereof, the plaintiffs cannot well claim to have been ignorant. I cannot therefore see anything in which the plaintiffs were invited to place their confidence and faith that the city was bound, or would maintain its railroad on Broad street for their use and convenience. The object and purposes of its construction were subserved and notoriously ended. It was thenceforth an independent road, the property of the city; and as nothing like a contract relation existed between the plaintiffs and the city in regard to its maintenance, and as it was an independent road in the outset, subject only to a running connection and use by the state, I am utterly at a loss thus far, at least, to discover any equity on the part of the plaintiffs to interfere with the city in exercising its rights of proprietorship in the road, and to remove it if it chooses.

Is there anything in the Act of 10th of May 1850, authorizing the sale of that portion of the state railroad from the foot of the inclined plane to the intersection at Vine and Broad streets, which changes this aspect? By § 39 of the act, the canal commissioners

[City of Philadelphia *v.* Philadelphia and Reading Railroad Co.]

were directed to give public notice " that the Schuylkill bridge, and all that part of the state road lying east of the inclined plane, together with all the real estate, and old materials, upon the part of the Philadelphia and Columbia Railroad, rendered useless by the new road, to avoid the inclined plane, will be for sale," and a minimum was fixed, below which the property was not to go. The advertisement was published and the property was sold, and bought by the plaintiffs.

This act was the authority and warrant of the canal commissioners to make the sale, and what to sell. They could not amplify it. Private agency could go no farther, and official agency is never more liberally expounded. As to such, the rule is strict construction. This is elementary law. The property designed to be sold is very explicitly described in the Act of Assembly, namely, all that part of the Philadelphia and Columbia Railroad east of the inclined plane—the real estate, and all the old materials on that portion of the road, rendered useless by the change of the road. There is not a word about rights or privileges in the city road to be found in the act. The state did not, and could not in common honesty, claim any. She had no claim to it by virtue of expenditures or by contract, and she offered none for sale. The only right she had was in its serviency, which had ceased. The conveyance by the canal commissioners to the plaintiffs, refers itself to the authority of the Act of Assembly, and that was necessarily the measure and extent of title which was to pass by the conveyance. The plaintiffs deceived themselves if they expected more. The word " appurtenances" used in the deed was not sufficient to pass any interest in the city railroad as insisted upon. One entire railroad will not pass by the word " appurtenance" to another railroad, any more than one tract of land would pass as appurtenant to another. But the words of the conveyance exclude all room for cavil on this point. After describing the subject of the grant, the words are, " together with all the railroad tracks, turnouts and sidelings and appurtenances thereunto belonging or appertaining, * * * from the foot of said plane to the said intersection," at Vine and Broad streets. Thus, is the conveyance confined to the road built by the state, and the privileges and appurtenances within these limits. By no reasonable construction can it operate beyond. This renders unnecessary a discussion of the nature of an appurtenance, and what usually passes by this term. On that subject, however, I may refer to an excellent illustration of it in Blaine's Lessee *v.* Chambers, 1 S. & R. 169.

If these views be correct, and we think they are, the city had the undoubted right to determine on removing and actually to remove the rails of its road from Broad street. It cannot be maintained that property built by the city for its corporate use may not be removed when the interests of community demand it, such as market, engine houses and the like, and I perceive no differ-

[City of Philadelphia v. Philadelphia and Reading Railroad Co.]

ence between such cases and where city property, such as this railroad, is built for city purposes under the sanction of the state. I therefore think that reliance on the Act of May 16th 1861, § 39, as an authority to the city for what it does, is not needed. At least it yields no more than an inference that prior to its passage the city had no right to remove the city road, on account of some supposed necessity for maintaining it in connection with the Pennsylvania Railroad Company; but it is also much more clearly inferable from the section that when *that road* should have completed a connection with the Philadelphia, Wilmington and Baltimore Road, then the councils might remove the city road from Broad street. There is no saving in favor of the Reading Railroad Company in the section, although the same connection existed between that road then, as existed when this bill was filed, and now. That connection has long since been consummated, and if the authority did not exist antecedently to remove this road, as we think it did, we are of opinion that it might have been rested on this act. We need not elaborate our views in regard to this further, I think.

It was rather faintly pressed that the proposition in the Act of the 16th of March 1831, to the city to engage to construct and *continue* the railroad from the intersection of Vine and Broad streets, *down Broad to Cedar street*, and accepted, was as an agreement to *maintain* it there. This is a position which is not at all maintainable. In the collocation of the words used, " *continue* " so obviously means to " *extend*," that argument is not required to refute the position. See Webs. Dic. *ad verb.* " continue."

The complainants insist that the city should be enjoined as prayed in this bill, because in 1865 they expended several thousand dollars in repairs on the city road. A ready and complete answer to this is, the public are not to be deprived of their rights by encroachment. Buildings erected on public grounds or on highways acquire no right either on account of time or expenditures: 16 S. & R. 390; 2 Watts 23; 9 Casey 202; 2 Harris 186; 3 Barr 202; 3 Phila. Rep. 368. Besides this bill was then pending, and no equity for expenditures could arise under such circumstances. But this position seems inconsistent with the position taken by the plaintiffs themselves in January 1863. In the report of the president to their board on the 12th of that month, it is stated, that with a view to remove the coal trade entirely from Broad street, the company had entered into a joint agreement with the Pennsylvania Railroad Company, and the Philadelphia, Wilmington and Baltimore Railroad Company to construct what is called the " Junction Railroad," on the west side of the Schuylkill from the foot of the inclined plane to the Baltimore Railroad at Gray's Ferry, and that it was expected to be completed in the month of June 1863. This was the state of facts when the

[City of Philadelphia *v.* Philadelphia and Reading Railroad Co.]

city passed the ordinance of the 18th May 1863, for the removal of the rails from the city road after the 1st of October ensuing. This justified the passage of the ordinance, even if prior thereto an arrangement had existed between the city and the plaintiff for the use of the city road, which, however, was not the case. It is not easy, therefore, to see in the light of such a fact as this, how the plaintiffs could have been misled into the expenditure of money in the repair of the city road thereafter. We see nothing improper or inequitable in the city acting on this public determination of the plaintiff, even if the latter owed some consideration to the former on account of a tacit assent that they might use its road.

An argument has been made by the plaintiffs against the city, based upon the Act of 23d of March 1866. But that act, so far as it has any applicability to them, is a private act, which has neither been pleaded nor put in evidence. I do not regard any portion of it as a public act, in the proper understanding of that idea; but certainly the 3d section, which gives countenance to the argument, relating exclusively as it does to the Reading Railroad Company, is private, and should have been pleaded, if relied on: Welford on Eq. Pl. p. 2. A section in a public statute, relating only to private parties, is to be regarded as a private act: Dwar. on Stat. 3 and 4. But considered in any light, no implication necessarily arises that the plaintiffs were intended by the act to be allowed damages against the city on account of its removal of the rails from the city railroad. That the company might be entitled to damages for the removal of rails from Broad street, west of the intersection at Vine and Broad streets, is another matter, and not before us, and to this doubtless the provision was intended to apply, and not to what it obviously would have been unjust to extend it to. It is hardly to be presumed that the state intended to confer upon the plaintiffs a right in terms so equivocal, and of such questionable justice. A corporation takes nothing by construction. All powers not conferred in a direct and unmistakable manner, are withheld: Commonwealth *v.* Erie & N. E. Railroad Co., 3 Casey 339. We discover nothing, therefore, in this act which at all interferes with the matter in controversy in this bill, or which should preclude action by the city authorities.

Another ground insisted on by the plaintiffs in argument and in their bill, is that if the city road is removed, they will be cut off from warehouses, founderies, manufactories, coal, lime and lumber yards on Broad street and Washington avenue, and from their connection with the Southwark railroad and the Delaware river. These form several charges in the bill, but as the right to maintain these connections is denied in the answer, and as our reply is the same in regard to all, we think it more convenient to group them together. I need only say, so far as the Southwark rail-

road is concerned, there is no law to show a legal and binding right to a connection with, or its dependence upon, the city railroad. It was chartered as an independent road before the city road was authorized or agreed to be built, and, as already said, there is neither statute nor contract shown, which binds the city to maintain its road to accommodate that road. This was the unanimous opinion of all the judges at Nisi Prius, in the case of the Southwark Railroad Company *v.* The City of Philadelphia, 11 Wright 314, and of that opinion we remain. The opinion of our brother Agnew in that case, we think, contains everything that ought, or could be profitably said on the subject of this claim now. This view, and that taken in Branson *v.* The City, same book, 329, settles all questions in regard to turnouts and warehouses along Broad street, or on the line of the Southwark railroad, and that the city is not bound to refrain from removing the city road on their account.

Again, it has been contended that the ordinance of the 18th May 1863, for the removal of the city railroad, is repealed by the subsequent ordinance of the 11th November 1865, on account of repugnancy of its provisions with the former. The city does not so understand it. Its law officer, the city solicitor, presses this case to a final determination, and informs the court that he does so under resolutions of the councils. This negatives the implication of a repeal. But all this ceases to be of consequence, if the plaintiffs have no right to the relief prayed, and we think they have not. These ordinances concern only the city, or persons having a legal right in the city road, and we think this is all that need be said on this point.

And lastly, it was strenuously insisted that this controversy was *res adjudicata;* that we are bound by the decision in this case, made at Nisi Prius, and reported in 11th Wright 325, granting the preliminary injunction referred to in the outset of this opinion against the city, all the judges having sat and heard the case as adsessors. I grant that this ought to be the rule where all the judges have heard and are unanimous on the merits of a case. That was not so in this case. There were two dissents, and there thus being a bare majority against the city, it was a good reason why it should demand a full hearing after answer and proofs, without being precluded by opinions expressed on the preliminary motion. One of the judges in the majority then, has on further reflection and argument, yielded the opinion then entertained, and agrees with the *dissentients* on that occasion; and one brother, who has since taken his seat on this bench, also concurs with them. Thus, four judges out of six, who first and last heard the case, are of opinion against the plaintiffs. In this state of the bench, it seems to me it would be manifestly unjust that the city should be bound by that preliminary adjudi-

[City of Philadelphia *v.* Philadelphia and Reading Railroad Co.]

cation. Without enlarging, we feel bound to say, in this case, that we cannot yield to the position of the plaintiffs, and seeing nothing in their case entitling them to the relief prayed, the decree for the perpetual injunction granted at Nisi Prius must be reversed, and the plaintiffs' bill dismissed at their costs.

Now, May 7th 1868. Let the entry be made in accordance with the decree.

STRONG and AGNEW, JJ., dissented.